NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-2956

THE STATE OF OHIO, APPELLEE, *v.* AALIM, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Aalim,* Slip Opinion No. 2017-Ohio-2956.]**

*Juvenile procedure—Due process—Equal protection—Mandatory transfer of juveniles to general division of common pleas court does not violate juveniles' rights to due process or equal protection under Article I, Sections 2 and 16 of Ohio Constitution or Fourteenth Amendment to United States Constitution—Due-process provisions of both constitutions predate creation of juvenile courts and therefore cannot have created substantive right to amenability hearing—Appellant's mandatory transfer satisfied fundamental fairness because juvenile court issued decision stating its reasons for transfer after conducting hearing at which appellant was represented by counsel—Juveniles are not a suspect class under either federal or Ohio's Equal Protection Clause—Mandatory transfer is rationally related to legitimate governmental purpose of increased punishments for serious juvenile offenders—Motion for reconsideration*

*granted and court of appeals' judgment upholding trial court's denial of appellant's motion to dismiss his indictment affirmed.*

(No. 2015-0677—Submitted February 7, 2017—Decided May 25, 2017.)

APPEAL from the Court of Appeals for Montgomery County,

No. 26249, 2015-Ohio-892.

ON MOTION FOR RECONSIDERATION.

_____

**KENNEDY, J.**

{¶ 1} This court has the authority to grant motions for reconsideration filed under S.Ct.Prac.R. 18.02 in order to "correct decisions which, upon reflection, are deemed to have been made in error." *State ex rel. Huebner v. W. Jefferson Village Council*, 75 Ohio St.3d 381, 383, 662 N.E.2d 339 (1995). In seeking reconsideration of this court's decision in *State v. Aalim*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __ ("*Aalim I*"), the state argues that the court failed to consider Article IV, Section 4(B) of the Ohio Constitution, which grants the General Assembly exclusive authority to define the jurisdiction of the courts of common pleas. We agree.

{¶ 2} Article IV, Section 4(B) of the Ohio Constitution grants exclusive authority to the General Assembly to allocate certain subject matters to the exclusive original jurisdiction of specified divisions of the courts of common pleas. *State v. Wilson*, 73 Ohio St.3d 40, 42, 652 N.E.2d 196 (1995). The General Assembly exercised that authority when it vested in the juvenile courts "exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 11, citing R.C. 2151.23(A). However, as part of Ohio's response to rising juvenile crime, in 1996, the General Assembly enacted

former R.C. 2151.26, now R.C. 2152.12,[1] *State v. Hanning*, 89 Ohio St.3d 86, 89, 728 N.E.2d 1059 (2000), citing Am.Sub.H.B. No. 1, 146 Ohio Laws, Part I, 1, 18, creating "a narrow exception to the general rule that juvenile courts have exclusive subject matter jurisdiction over any case involving a child," *Wilson* at 43. Under R.C. 2152.12, a juvenile who has committed a qualifying offense and who meets certain age requirements is automatically removed from the jurisdiction of the juvenile division and transferred to adult court.

{¶ 3} This court's ruling in *Aalim I* declared that the Ohio Constitution requires that a juvenile who is subject to mandatory bindover receive an amenability hearing. *Aalim I* at ¶ 25. Implicit in *Aalim I* is the conclusion that a juvenile-division judge has discretion in deciding whether to transfer to adult court a juvenile in a case in which the juvenile is 16 or 17 years old and there is probable cause to believe that the juvenile committed an offense outlined in R.C. 2152.10(A)(2)(b). Our decision in *Aalim I* therefore usurped the General Assembly's exclusive constitutional authority to define the jurisdiction of the courts of common pleas by impermissibly allowing a juvenile-division judge discretion to veto the legislature's grant of jurisdiction to the general division of a court of common pleas over this limited class of juvenile offenders. Therefore, we grant the state's motion for reconsideration.

{¶ 4} Having granted reconsideration, we turn to the original questions presented and determine that the mandatory bindover of certain juveniles to adult court under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) does not violate the Due Course of Law Clause or the Equal Protection Clause of the Ohio Constitution and the analogous provisions of the Fourteenth Amendment to the United States Constitution.

---

[1] In 2000, R.C. 2151.26 was amended and recodified as R.C. 2152.12. *See* 2000 Sub.S.B. No. 179.

## I. CASE BACKGROUND

{¶ 5} On December 3, 2013, appellee, the state of Ohio, filed a complaint in the Juvenile Division of the Montgomery County Court of Common Pleas, alleging that appellant, Matthew I. Aalim, engaged in conduct that would be considered aggravated robbery in violation of R.C. 2911.01(A)(1) if committed by an adult. The complaint also contained a firearm specification. The state filed a motion to transfer Aalim, requesting that the juvenile court relinquish jurisdiction and transfer him to the general division of the common pleas court to be tried as an adult pursuant to Juv.R. 30, R.C. 2152.10(A)(2)(b), and R.C. 2152.12(A)(1)(b).

{¶ 6} On January 10, 2014, Aalim appeared before the Juvenile Division of the Montgomery County Court of Common Pleas for a hearing on whether the juvenile court should relinquish jurisdiction over Aalim's case. At the hearing, Aalim was represented by counsel and his mother was also present. After the hearing, the juvenile court issued an order and entry finding that Aalim was 16 years old at the time of the alleged offense and that there was probable cause to believe that he had committed the conduct alleged in the complaint, including the firearm specification. Based on these findings, the juvenile court recognized that it no longer had jurisdiction and transferred the case to the general division of the common pleas court as required under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b). An indictment was issued charging Aalim with two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) with accompanying firearm specifications. The two counts of aggravated robbery charged in the indictment reflected the fact that there were two victims of the alleged conduct.

{¶ 7} Aalim filed a motion to dismiss the indictment and transfer his case back to juvenile court, arguing that mandatory bindover of juveniles pursuant to R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) violates their rights to due process and equal protection as well as the prohibition against cruel and unusual punishments under both the United States and Ohio Constitutions. The trial court overruled the

motion, and Aalim entered pleas of no contest to the two counts of aggravated robbery. The court accepted the pleas, dismissed the firearm specifications consistently with a plea agreement that the parties had reached, and sentenced Aalim to concurrent prison terms of four years on each count.

**{¶ 8}** The Second District Court of Appeals affirmed the trial court's judgment, rejecting Aalim's challenges to the mandatory-bindover statutes. Rejecting Aalim's due-process argument, the court of appeals relied on a previous decision to hold that the mandatory-bindover scheme of R.C. 2152.12 comports with fundamental concepts of due process. 2015-Ohio-892, ¶ 7-9, citing *State v. Brookshire*, 2d Dist. Montgomery No. 25853, 2014-Ohio-1971, ¶ 30. It also rejected Aalim's equal-protection argument, concluding that the singling out of juveniles aged 16 and 17 charged with serious offenses is rationally related to the legitimate governmental purpose of protecting society and reducing violent crime by juveniles. *Id.* at ¶ 13-17, citing *State v. Anderson*, 2d Dist. Montgomery No. 25689, 2014-Ohio-4245, ¶ 72-75. Aalim also raised a cruel-and-unusual-punishments challenge, which the Second District rejected. 2015-Ohio-892 at ¶ 19-21. He has not included his cruel-and-unusual-punishments argument in this appeal.

**{¶ 9}** We accepted jurisdiction over two propositions of law, which ask us to hold that R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) violate juveniles' rights to due process and equal protection as guaranteed by the United States and Ohio Constitutions. *See* 143 Ohio St.3d 1498, 2015-Ohio-4468, 39 N.E.3d 1270. On December 22, 2016, we issued an opinion reversing the Second District's judgment and declaring that the mandatory-bindover statutes were unconstitutional because they violated juveniles' right to due process as guaranteed by Article I, Section 16 of the Ohio Constitution. *Aalim I*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __. On January 3, 2017, the state moved for reconsideration. We grant the motion for reconsideration, which we address in this opinion.

## II. LEGAL ANALYSIS

{¶ 10} Aalim presents facial due-process and equal-protection challenges to R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b). His arguments regarding due process are (1) that fundamental fairness requires that every juvenile receive an opportunity to demonstrate a capacity to change, (2) that youth must always be considered as a mitigating—not aggravating—factor, (3) that the irrebuttable presumption of transfer contained in the statutes is fundamentally unfair, and (4) that juveniles have a substantive due-process right to have their youth and its attendant characteristics taken into account during a bindover proceeding.

{¶ 11} In support of his equal-protection claim, Aalim argues (1) that the mandatory-bindover statutes create classes of similarly situated juveniles who are treated differently based solely on their ages, (2) that a juvenile's status as a juvenile is a suspect class for purposes of equal-protection analysis, and (3) that the age-based distinctions in the mandatory-bindover statutes are not rationally related to the purpose of juvenile-delinquency proceedings.

{¶ 12} The state counters that the mandatory-bindover statutes satisfy constitutional due-process requirements because they provide for all the required procedural safeguards, such as the right to notice, the right to counsel, the right to confront and cross-examine witnesses, the right to introduce evidence on one's own behalf, the privilege against self-incrimination, and protection from double jeopardy. Additionally, the state argues that substantive due process does not give Aalim the right to an amenability hearing. The state also argues that Aalim's equal-protection challenge fails because the mandatory-bindover statutes do not infringe upon a fundamental right or affect a suspect class and are rationally related to a legitimate governmental interest.

{¶ 13} R.C. 2152.10(A) sets forth which juvenile cases are subject to mandatory bindover and provides:

(A) A child who is alleged to be a delinquent child is eligible for mandatory transfer and shall be transferred as provided in section 2152.12 of the Revised Code in any of the following circumstances:

(1) The child is charged with a category one offense and either of the following apply:

(a) The child was sixteen years of age or older at the time of the act charged.

(b) The child was fourteen or fifteen years of age at the time of the act charged and previously was adjudicated a delinquent child for committing an act that is a category one or category two offense and was committed to the legal custody of the department of youth services upon the basis of that adjudication.

(2) The child is charged with a category two offense, other than a violation of section 2905.01 of the Revised Code, the child was sixteen years of age or older at the time of the commission of the act charged, and either or both of the following apply:

(a) The child previously was adjudicated a delinquent child for committing an act that is a category one or a category two offense and was committed to the legal custody of the department of youth services on the basis of that adjudication.

(b) The child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged.

Aggravated robbery is a category-two offense, R.C. 2152.02(BB)(1), and Aalim was 16 years old at the time the offense was committed. Because he was also

charged with a firearm specification, automatic transfer was required. R.C. 2152.10(A)(2)(b). A juvenile court must transfer a juvenile to adult court automatically under these circumstances if "there is probable cause to believe that the child committed the act charged." R.C. 2152.12(A)(1)(b)(ii).

## A. Due Process and Due Course of Law

{¶ 14} Aalim's due-process argument fits into two categories. First, Aalim claims that juveniles have a substantive-due-process right to an individualized determination by a juvenile-division judge in an amenability hearing. Second, Aalim argues that the General Assembly's decision to grant jurisdiction over a special class of juvenile offenders to the general division of the common pleas courts violates the "fundamental fairness" requirement of Ohio's Due Course of Law Clause and the Fourteenth Amendment's Due Process Clause.

{¶ 15} Since 1887, this court has equated the Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Adler v. Whitbeck*, 44 Ohio St. 539, 569, 9 N.E. 672 (1887). *See also State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 8, 399 N.E.2d 66 (1980) (stating that Ohio courts may look to decisions of the United States Supreme Court to give meaning to Ohio's Due Course of Law Clause). We have reaffirmed this view as recently as last year. *See State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, ¶ 11 ("The 'due course of law' provision is the equivalent of the 'due process of law' provision in the Fourteenth Amendment to the United States Constitution"), citing *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544, 38 N.E.2d 70 (1941). Additionally, we have considered United States Supreme Court decisions "as giving the true meaning of the guaranties of the Ohio Bill of Rights." *Direct Plumbing Supply* at 545.

*1. Substantive Due Process*

{¶ 16} The Supreme Court's "established method of substantive-due-process analysis has two primary features." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). First, the court has "observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition' * * * and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " *Id*. at 720-721, quoting *Moore v. E. Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion), and *Palko v. Connecticut*, 302 U.S. 319, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Second, the court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Id*. at 721, quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.E.2d 1 (1993). The court has cautioned against using the Fourteenth Amendment to define new fundamental liberty interests without "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition." *Id.* at 722. The court has observed that "[t]his approach tends to rein in the subjective elements that are necessarily present in due-process judicial review." *Id*.

{¶ 17} Aalim's substantive-due-process argument can be disposed of in short order. Ohio's Due Course of Law Clause was adopted in 1851, and the Fourteenth Amendment to the United States Constitution, which contains the federal Due Process Clause, was ratified in 1868. The first juvenile court in the United States was established in 1899 in Cook County, Illinois, and the first juvenile court in Ohio was the Cuyahoga County Juvenile Court, established in 1902. Supreme Court of Ohio, *Desktop Guide for Juvenile Court Clerks* 1-1 (2007). It was not until 1937 that the General Assembly established juvenile courts throughout the state, *see* Am.S.B. No. 268, 117 Ohio Laws 520, 522, and the amenability hearing was not added to the juvenile-court system until 1969, *see*

Am.H.B. No. 320, 133 Ohio Laws, Part II, 2040, 2049. Because Ohio's Due Course of Law Clause and the federal Due Process Clause both predate the creation of juvenile courts in Ohio and throughout the United States, these provisions cannot have created a substantive right to a specific juvenile-court proceeding. Therefore, an amenability hearing cannot be "deeply rooted in this Nation's history and tradition" and " 'implicit in the concept of ordered liberty,' " *Moore* at 503, quoting *Palko* at 326.

{¶ 18} Justice O'Neill's dissenting opinion contends that the United States Supreme Court has refused to rely solely on historical analysis when interpreting the Fourteenth Amendment's substantive-due-process protection. Dissenting opinion, O'Neill, J., at ¶ 117 (" 'Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects' "), quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847-848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). However, his dissent ignores the fact that since *Casey*, the court has been " 'reluctant to expand the concept of substantive due process,' " *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion), quoting *Collins v. Harker Hts.*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), and has continually limited substantive-due-process protections to matters relating to "marriage, family, procreation, and the right to bodily integrity," *id.* at 272, citing *Casey* at 847-849; *see also Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (relying on *Casey* to conclude that the Fourteenth Amendment protects the right of two consenting adults of the same sex to engage in sexual conduct); *Obergefell v. Hodges*, __ U.S. __, 135 S.Ct. 2584, 2599, 192 L.Ed.2d 609 (2015) (the right to personal choice regarding marriage is inherent in the concept of individual autonomy protected by substantive due process under the Fourteenth Amendment). *Compare Glucksberg*, 521 U.S. at 727, 117 S.Ct. 2258,

138 L.Ed.2d 772 (the right to physician-assisted suicide is not one of those personal activities and decisions that th[e] Court has identified as "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty that they are protected by the Fourteenth Amendment").

{¶ 19} Importantly, the court has been far more skeptical of creating new rights based on substantive due process in criminal-procedure cases. In *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, the court declined to recognize a substantive-due-process right to access DNA evidence for testing because establishing such a right "would force [the justices] to act as policymakers." 557 U.S. 52, 73-74, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009). And in *Flores*, the court declined to recognize a substantive-due-process right asserted by undocumented juveniles awaiting deportation proceedings to private placement with responsible adults instead of detention in the custody of the Immigration and Nationalization Service (INS) because such a right was not " ' "so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " 507 U.S. at 303, 113 S.Ct. 1439, 123 L.Ed.2d 1, quoting *United States v. Salerno*, 481 U.S. 739, 751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Comparing *Flores* and *Osborne* to the court's substantive-due-process jurisprudence in privacy cases demonstrates that the court has confined its broad interpretation of substantive due process to cases in which government actions prohibited private conduct and infringed on personal autonomy.

{¶ 20} Finally, since *Casey*, the court has not categorically refused to rely exclusively on historical analysis when interpreting Fourteenth Amendment protections. *See McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). In *McDonald*, the court determined that the Second Amendment right to keep and bear arms applies to the states under the Fourteenth Amendment's Due Process Clause. *Id.* at 791. The court reached this conclusion using a *Glucksberg*

historical analysis, *McDonald* at 767, concluding that "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," *id.* at 778.

{¶ 21} The touchstones of the court's analysis of substantive-due-process claims are whether the asserted right is grounded in history and tradition and whether the right protects against government intrusion into private conduct, *Flores* at 303; *Lawrence*, 539 U.S. at 578, 123 S.Ct. 2472, 156 L.Ed.2d 508—not, as Justice O'Neill's dissent suggests, whether the right is a valid "expression of our social conscience," dissenting opinion, O'Neill, J., at ¶ 116.

*2. Fundamental Fairness*

{¶ 22} Next, we address Aalim's fundamental-fairness due-process argument. As the United States Supreme Court has observed, "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined." *Lassiter v. Durham Cty. Dept. of Social Servs.*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Due process is a flexible concept that varies depending on the importance attached to the interest at stake and the particular circumstances under which the deprivation may occur. *Walters v. Natl. Assn. of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). "Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Lassiter* at 24-25. *Accord In re D.S.*, 146 Ohio St.3d 182, 2016-Ohio-1027, 54 N.E.3d 1184, ¶ 28 (what process satisfies Article I, Section 16 of the Ohio Constitution "depends on considerations of fundamental fairness in a particular situation"), citing *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 80, and *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 71.

**{¶ 23}** Due-process rights are applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. *C.S.* at ¶ 79, citing *In re Gault*, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *C.P.* at ¶ 70. This court has observed that in the context of a juvenile-court proceeding, the term "due process" " 'expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty.' " *C.S.* at ¶ 80, quoting *Lassiter* at 24. While we have not explicitly articulated what "fundamental fairness" means in a juvenile proceeding, "[a] court's task is to ascertain what process is due in a given case, * * * while being true to the core concept of due process in a juvenile case—to ensure orderliness and fairness." *Id.* at ¶ 81, citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion).

**{¶ 24}** "The safeguard of a hearing is contained in the Revised Code and Rules of Juvenile Procedure, and it is grounded in due process and other constitutional protections." *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 20. In *United States v. Kent*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Supreme Court considered what is necessary to satisfy due process in the bindover context. Initially, the court declined to extend all constitutional guarantees that would be applicable to adults. *Id.* at 556. Importantly, however, the court did determine that "constitutional principles relating to due process" are applicable to juveniles. *Id.* at 557. For purposes of bindover from juvenile court to adult court, the court held that due process is satisfied when a juvenile court issues a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel. *Id.* at 554.

**{¶ 25}** As recently as three years ago, this court recognized: "[T]he Supreme Court of the United States has held that the bindover hearing is a 'critically

important proceeding' and that the hearing 'must measure up to the essentials of due process and fair treatment.' " *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 11, quoting *Kent* at 562.  Moreover, we have quoted *Kent* for the rule that a transfer of a juvenile to adult court should not occur " 'without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons.' " *D.W.* at ¶ 20, quoting *Kent* at 554.

**{¶ 26}** Relying on the fundamental fairness required by procedural due process, the Chief Justice's dissenting opinion argues that *Kent* requires that a juvenile court judge make an "*individualized* assessment" based on a " 'full investigation' [that] require[s] consideration of the ' "entire history of the child" ' " before transferring a juvenile to adult court.  (Emphasis sic.)  Dissenting opinion, O'Connor, C.J., at ¶ 99, quoting *Kent* at 559, quoting *Wakins v. United States*, 343 F.2d 278, 282 (D.C.Cir.1964).  However, this portion of *Kent* is distinguishable from the facts at issue here.  The General Assembly determines the jurisdiction of the juvenile court.  Ohio Constitution, Article IV, Section 4(B).  And the General Assembly has determined that in the limited circumstances described in R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b), juvenile offenders of a certain age charged with aggravated murder, murder, certain serious felonies committed after a prior delinquency adjudication, and certain serious felonies committed with a firearm shall be bound over to adult court.  In *Kent*, the United States Supreme Court was not declaring that the requirement of the Juvenile Court Act for a "full investigation" before transfer was constitutionally required.  *Id.* at 547.  Instead, the court declined to use the *Kent* decision to broadly apply adult constitutional guarantees to children.  *Id.* at 556.  The court decided *Kent* based on the unique requirements of the applicable statute, the Juvenile Court Act, and it went "no further."  *Id.*  Moreover, the reliance by the Chief Justice's dissent on United States Supreme Court precedents interpreting juvenile offenders' Eighth Amendment protections is misplaced because those cases were decided based on the Eighth

14

Amendment, not on the procedural protections found in the Due Process Clause of the Fourteenth Amendment. *See* dissenting opinion, O'Connor, C.J., at ¶ 58.

{¶ 27} Here, Aalim's mandatory bindover from the juvenile division to the general division of the common pleas court satisfied the requirements of "fundamental fairness" required by Ohio's Due Course of Law Clause and the federal Due Process Clause. Aalim had a hearing before a juvenile-division judge to determine Aalim's age at the time of the alleged offense and whether there was probable cause to believe that he had committed the conduct alleged in the complaint. At this hearing, Aalim was represented by counsel and he had a parent present. After the hearing, the juvenile court issued an entry explaining why it no longer had jurisdiction over Aalim. Only after this proceeding satisfying the fundamental fairness required by Ohio's Due Course of Law Clause and the federal Due Process Clause was Aalim transferred from the juvenile division to the general division of the common pleas court. Aalim has failed to show that his bindover violated his due-process rights, let alone that the mandatory-bindover statutes facially violate the constitutional due-process guarantees.

## B. Equal Protection

{¶ 28} Aalim raises two arguments in support of his claim that R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) violate juveniles' equal-protection rights. First, Aalim contends that juveniles are a suspect class and that therefore, treating some juveniles differently triggers strict scrutiny. Additionally, he argues that the age-based distinctions of the mandatory-bindover statutes are not rationally related to the purpose of juvenile proceedings.

{¶ 29} The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Ohio's Equal Protection Clause, Article I, Section 2 of the Ohio Constitution, provides, "All political power is inherent in the people. Government is instituted for their equal protection and

benefit * * *." These two equal-protection provisions are functionally equivalent and require the same analysis. *Eppley v. Tri-Valley Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 56, 2009-Ohio-1970, 908 N.E.2d 401, ¶ 11.

{¶ 30} "In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment * * *, [courts] apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). We use the same analytic approach in determining whether a statutory classification violates Article I, Section 2 of the Ohio Constitution. *State v. Williams*, 88 Ohio St.3d 513, 530, 728 N.E.2d 342 (2000).

{¶ 31} The first step in an equal-protection analysis is to determine the proper standard of review. *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 64. When legislation infringes upon a fundamental constitutional right or the rights of a suspect class, strict scrutiny applies. *See Williams* at 530. If neither a fundamental right nor a suspect class is involved, the rational-basis test is used. *See, e.g.*, *Menefee v. Queen City Metro*, 49 Ohio St.3d 27, 29, 550 N.E.2d 181 (1990).

{¶ 32} In order for Aalim's facial equal-protection challenge to the mandatory-bindover statutory scheme to qualify for strict-scrutiny review, Aalim must demonstrate that juveniles are a suspect class or that juveniles have a fundamental constitutional right to an amenability proceeding. *See Williams* at 530.

{¶ 33} A "suspect class" is defined as "one 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.' " *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The United States Supreme Court has noted that "age is not a suspect

classification under the Equal Protection Clause." *Gregory v. Ashcroft*, 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). *Accord State v. Fortson*, 11th Dist. Portage No. 2011-P-0031, 2012-Ohio-3118, ¶ 41 ("Ohio courts have consistently held that juveniles do not constitute a suspect class in the context of equal protection law"); *In re Vaughn*, 12th Dist. Butler No. CA89-11-162, 1990 WL 116936, *5 (Aug. 13, 1990) ("[J]uveniles have never been treated as a suspect class and legislation aimed at juveniles has never been subjected to the test of strict scrutiny"). Under both Ohio and federal law, juveniles are not considered a suspect class, and we decline to define them as one now. And as discussed above with respect to substantive due process, juveniles do not have a fundamental right to an amenability hearing, because the right to such a hearing is not "deeply rooted in this Nation's history and tradition" and " 'implicit in the concept of ordered liberty,' " *Moore*, 431 U.S. at 503, 97 S.Ct. 1932, 52 L.Ed.2d 531, quoting *Palko*, 302 U.S. at 325, 58 S.Ct. 149, 82 L.Ed. 288.

**{¶ 34}** Because the mandatory-bindover statutes do not involve a fundamental right or a suspect class, we review the statutes under the rational-basis test, which requires us to uphold the statutes if they are rationally related to a legitimate governmental purpose, *see Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 66, citing *Williams*, 88 Ohio St.3d at 530, 728 N.E.2d 342. Under rational-basis review, we grant "substantial deference" to the General Assembly's predictive judgment. *Williams* at 531.

**{¶ 35}** Under rational-basis review, a decision by the state to treat individuals differently is invalidated only when it is " 'based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify' " it. *Id.*, quoting *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), and citing *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), and *Am. Assn. of Univ. Professors, Cent.*

*State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286 (1999).

{¶ **36**} This court has noted that

> according to some statistics, between 1965 and 1990, juvenile arrests for violent crime quadrupled. Redding, Juveniles Transferred to Criminal Court: Legal Reform Proposals Based on Social Science Research (1997), 1997 Utah L.Rev. 709, 762. As the juvenile crime rate began to rise, the public demanded tougher treatment of juveniles, and policymakers around the nation rushed to legislate a cure. See, generally, Rossum, Holding Juveniles Accountable: Reforming America's "Juvenile Injustice System (1995), 22 Pepperdine L.Rev. 907.

*Hanning*, 89 Ohio St.3d at 89, 728 N.E.2d 1059. The General Assembly enacted the mandatory-bindover procedure to provide special measures for extraordinary cases, involving older or violent offenders. *Id*. at 89-90. We recognized in *Hanning* that former R.C. 2151.26(B)(4)(b), the mandatory-bindover provision applicable to 16-year-olds who committed a category-two offense with a firearm, was "a narrow exception to the usual criteria for determining amenability in certain situations where an older child has been accused of an inherently dangerous offense." *Id.* at 92. Prosecuting older juveniles who commit serious crimes in the general division of a common pleas court is rationally related to the legitimate state interest of fighting rising juvenile crime because it allows the most serious juvenile offenders to be prosecuted in the general division, where harsher punishments are available. This court has recognized that "harms suffered by victims are not dependent upon the age of the perpetrator." *C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, at ¶ 74.

**{¶ 37}** Moreover, there is an explicit mandate in Article IV, Section 4(B) of the Ohio Constitution for the General Assembly to define the jurisdiction of all divisions of the common pleas courts in this state, and this court is duty bound to follow the structure established by the people of Ohio in our state Constitution. Therefore, the General Assembly could rationally achieve the legitimate state interest of decreased juvenile crime by redefining the jurisdiction of the juvenile divisions of the common pleas courts. The mandatory-bindover statutory scheme is rationally related to the legitimate governmental purpose of increased punishments for serious juvenile offenders, so it does not violate juveniles' right to equal protection under Article I, Section 2 of the Ohio Constitution.

### III. CONCLUSION

**{¶ 38}** Because this court failed in *Aalim I*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, to consider the General Assembly's exclusive constitutional authority to define the jurisdiction of the courts of common pleas under Article IV, Section 4(B) of the Ohio Constitution, we grant the state's motion for reconsideration pursuant to S.Ct.Prac.R. 18.02. Upon reconsideration, we hold that the mandatory bindover of certain juvenile offenders under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) complies with due process and equal protection as guaranteed by the Ohio and United States Constitutions. We therefore vacate our decision in *Aalim I*, and we affirm the judgment of the court of appeals upholding the trial court's denial of Aalim's motion to dismiss his indictment.

Motion for reconsideration granted
and judgment affirmed.

O'DONNELL, FRENCH, and DEWINE, JJ., concur.

DEWINE, J., concurs, with an opinion joined by O'DONNELL, J.

FISCHER, J., concurs in part and dissents in part, with an opinion.

O'CONNOR, C.J., dissents, with an opinion joined by O'NEILL, J.

O'NEILL, J., dissents, with an opinion.

_____

**DEWINE, J., concurring.**

{¶ 39} I join fully in the court's decision. I write separately to emphasize why reconsideration is so important in this case. In my view, *State v. Aalim*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __ ("*Aalim I*"), was wrongly decided because it contains an error in legal analysis. But of even greater concern is the court's application of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Course of Law Clause of the Ohio Constitution.

{¶ 40} The Due Process Clause prohibits a state from depriving "any person of life, liberty, or property, without due process of law." Fourteenth Amendment to the U.S. Constitution, Section 1. While the clause on its face would seem to concern itself with only the adequacy of procedures employed when one is deprived of life, liberty, or property, the United States Supreme Court has read it to include a substantive component that forbids some government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Unlike procedural due process, the substantive component of the Due Process Clause "is suggested neither by its language nor by preconstitutional history." *Moore v. E. Cleveland*, 431 U.S. 494, 543, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (White, J., dissenting).

{¶ 41} There is a clear demarcation between the two concepts. While procedural due process assesses the adequacy of procedures employed, substantive due process reviews legislative enactments. When the legislature passes a law of general application, there is no question about the adequacy of the procedures; the legislative process provides all the process that is due. *See* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure*, Section 17.8(c), at 130 (5th Ed.2012); *75 Acres, L.L.C. v. Miami-Dade Cty.*, 338 F.3d 1288, 1294 (11th Cir.2003); *Richmond Boro Gun Club, Inc. v. New York*, 97 F.3d 681,

689 (2d Cir.1996); *Diaz v. Riverside*, 895 F.2d 1416 (9th Cir.1990) (unpublished table decision), available at 1990 WL 11925, *4; *Oklahoma Edn. Assn. v. Alcoholic Beverage Laws Enforcement Comm.*, 889 F.2d 929, 936 (10th Cir.1989); *Cty. Line Joint Venture v. Grand Prairie*, 839 F.2d 1142, 1144 (5th Cir.1988); *Brown v. Retirement Commt. of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 527 (7th Cir.1986). Thus, a challenge to a generalized legislative determination—for example, that all juveniles of a certain age who are charged with certain qualifying crimes must be tried in adult court—is made under the substantive component of the Due Process Clause. Rotunda & Nowak at 130; *75 Acres* at 1294; *Richmond Boro Gun Club* at 689; *Cty. Line Joint Venture* at 1144; *Brown* at 527.

**{¶ 42}** Somehow, however, our jurisprudence has muddled the two concepts. This confusion first became evident in *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729. There, we dealt with a challenge to automatic, lifelong registration and notification requirements for juvenile sex offenders tried within the juvenile system. Since the government action at issue was a legislative enactment that applied generally to all juveniles convicted of certain charges, the only possible due-process challenge was a substantive one. Yet, rather than analyze the challenge under traditional substantive-due-process norms—asking whether the restriction was rationally related to a legitimate legislative interest, *see, e.g., Toledo v. Telling*, 114 Ohio St.3d 278, 2007-Ohio-3724, 871 N.E.2d 1152, ¶ 33—the court analyzed the enactment under a principle of fundamental fairness.

**{¶ 43}** Heretofore, the fundamental-fairness standard had always been a *procedural* standard—one developed by the United States Supreme Court in assessing the adequacy of procedures employed in juvenile proceedings. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 541-543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion), citing *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Although the court was not explicit in *C.P.* about what it was doing—the term

substantive due process was never even mentioned—the import of its decision was to take the procedural fundamental-fairness standard and transform it into a substantive standard.

{¶ 44} In *Aalim I*, the court went even further. The court referred to *C.P.* and its fundamental-fairness standard. *Aalim I*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, at ¶ 19. But, perhaps in recognition of the dubious progeny of that decision as a matter of federal constitutional jurisprudence, it decided the case under the Ohio Constitution. The court did so by grafting the fundamental-fairness standard onto the Ohio Constitution: "[W]e hold that the right to due process under the Ohio Constitution requires that all children have the right to an amenability hearing before transfer to adult court and that the mandatory-transfer statutes violate the right to due process as guaranteed by Article I, Section 16 of the Ohio Constitution." *Id.* at ¶ 25. Quite a feat: in *C.P.*, the court takes a procedural due-process standard and transforms it into a substantive one; in *Aalim I*, that substantive due-process standard is transplanted into the Ohio Constitution. Fortunately, our rules provide us an opportunity to reconsider that decision.

{¶ 45} It is true, of course, that our state Constitution is a document of independent force that may provide greater protection than the United States Constitution. *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus. But recognition that our Constitution may provide greater protection does not give us unfettered license to strike down legislative enactments with which we disagree. Rather, in construing our state Constitution, we are bound by the text of the document as understood in light of our history and traditions.

{¶ 46} Certainly nothing in the language of Article I, Section 16 of our Constitution is even remotely implicated by the mandatory-bindover provision:

> All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

And as the majority points out, nothing in our history and traditions suggests that the Due Course of Law Clause mandates that juveniles receive an individualized determination about where their case is heard. Majority opinion at ¶ 17. Just the opposite: at the time of the adoption of the Due Course of Law Clause, there were no juvenile courts in Ohio. *Id.*

{¶ 47} There is good reason to step back from the addition of this new substantive-due-process standard of fundamental fairness to the Ohio Constitution. The doctrine of substantive due process has been perhaps the most bedeviling and controversial part of our federal constitutional tradition. Indeed, some of the most criticized judicial decisions in American history fall under the rubric of substantive due process. *See, e.g.*, *Dred Scott v. Sandford*, 60 U.S. 393, 15 L.Ed. 691 (1857); *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). With fair justification, substantive due process has been decried as a "poster child" for judicial use of amorphous constitutional doctrine to achieve a court's own "policy goals." *Johnson v. United States*, __ U.S. __, 135 S.Ct. 2551, 2567, 192 L.Ed.2d 569 (2015) (Thomas, J., concurring). Because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," courts have "always been reluctant to expand the concept of substantive due process." *Collins v. Harker Hts.*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

{¶ 48} We should be similarly reluctant to read substantive-due-process-type concepts into the Ohio Constitution. While it is our duty to independently interpret the Ohio Constitution and to enforce its guarantees, we should not treat

this responsibility as license to impose policy preferences unconnected with text and tradition. Indeed, the troubled history of federal substantive-due-process analysis ought to cause us to pause before incorporating similarly nebulous doctrine into our Constitution.

{¶ 49} Fundamental fairness makes perfect sense as a procedural standard. As courts, we are equipped by training and experience to make individualized determinations as to whether particular procedures that result in a loss of liberty are fundamentally fair. But to transform fundamental fairness into a substantive standard simply invites courts to substitute their policy preferences for those of the legislature without any standards to guide such a task.

{¶ 50} It may well be a good idea to end all mandatory bindovers. But it is not our call to make. Nothing in our Constitution ordains that we, rather than the people's elected representatives, get to make that decision.

O'DONNELL, J., concurs in the foregoing opinion.

_____

**FISCHER, J., concurring in part and dissenting in part.**

{¶ 51} For the reasons stated in my separate opinion in *State v. Gonzales*, ___ Ohio St.3d ___, 2017-Ohio-777, ___ N.E.3d ___, ¶ 24, I respectfully vote to deny the motion for reconsideration, but I join the majority's opinion on the merits in this case.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 52} In declaring our nation's independence, the founders decreed that the inalienable right to liberty was a self-evident truth. The founders recognized that they were asking a substantial sacrifice of colonists: to give up some of that liberty to live in a civil society on the mere promise that the government would secure their liberty and other important rights. Advocating for ratification of the Constitution, Alexander Hamilton offered reassurance to doubters that their rights would be

protected by checks and balances because "liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments." *The Federalist No. 78* at 523 (Cooke Ed.1961).

**{¶ 53}** James Madison also supported the separation of powers, writing that it "is admitted on all hands to be essential to the preservation of liberty" but warning that another particularly applicable consideration in American government would be "to guard one part of the society against the injustice of the other part." *The Federalist No. 51* at 351 (Cooke Ed.1961). Madison advised:

Justice is the end of government. It is the end of civil society. It ever has been, and ever will be pursued, until it be obtained, or until liberty be lost in the pursuit. In a society under the forms of which the stronger faction can readily unite and oppress the weaker, anarchy may as truly be said to reign as in a state of nature, where the weaker individual is not secured against the violence of the stronger * * * .

*Id.* at 352.

**{¶ 54}** The majority's decision today brings us one step closer to the anarchy about which Madison warned. The majority blindly affirms the constitutionality of the mandatory-transfer statute's process without even a perfunctory analysis of its due-process implications. The majority's holding does not bring justice for Ohio's children, who are among our weakest citizens, nor does it honor the sacrifices of our founders by "secur[ing] the Blessings of Liberty" to future generations, U.S. Constitution, preamble. Instead, the majority bows to the basest instincts of an outspoken faction of our society—fear and anger—to reach a result that violates all notions of separation of powers by advancing the interests of the executive and legislative branches at the expense of the judiciary. In its effort

SUPREME COURT OF OHIO

to punish appellant, Matthew I. Aalim, the majority shows no respect for the judiciary's role of ensuring that no legislative act contrary to the Constitution be allowed to stand. We all will suffer, at least in the short term, as a result of today's decision.

{¶ 55} Fortunately, however, the United States Supreme Court has not been so quick to dispense with its own role or the principles upon which our country was founded. The high court recognizes that "[d]ue process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise." *In re Gault*, 387 U.S. 1, 20, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

{¶ 56} The right to due process of law is not limited to adults facing a deprivation of liberty. *Id.* at 13. Rather, it is an essential and eternal promise of the Constitution to all Americans, including our youth. Although a child is too young to vote for their legislators and, in Ohio, their judges, those legislators and judges cannot ignore the constitutional protections safeguarding a child's liberty. And even though good motives may have informed the development of the juvenile court systems throughout the United States, the Supreme Court has reminded us that "[t]he absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness." *Id.* at 18-19.

{¶ 57} After today, in Ohio, an alleged juvenile offender will once again be subject to mandatory transfer out of juvenile court to face an adult criminal conviction on a mere showing of probable cause to believe that the child committed the offense charged, regardless of whether the child is amenable to rehabilitation and treatment in the juvenile-justice system. To deprive a child of his or her liberty

with such limited procedure falls short of the "procedural regularity and exercise of care implied in the phrase 'due process.' " *Id.* at 27-28.

{¶ 58} A majority of the court, under the guise of judicial restraint, reverses on a motion for reconsideration of our decision in *State v. Aalim*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __ ("*Aalim I*").[2]  But make no mistake: the court's decision approves the arbitrary deprivation of access to the juvenile system and what should be the sine qua non of juvenile-transfer hearings—the determination whether the juvenile is amenable to rehabilitation.  The majority does so by affording blind deference to the legislature, ignoring the requirements of due process and fairness, and artificially constraining the United States Supreme Court's commands that we must consider juvenile offenders differently than adult offenders, *see Miller v. Alabama*, 567 U.S. 460, 470, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (holding that sentences imposing mandatory life imprisonment without the possibility of parole on individuals who committed their crimes when under the age of 18 violates the Eighth Amendment to the United States Constitution); *J.D.B. v. North Carolina*, 564 U.S. 261, 265, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (holding that police must consider the age of a juvenile suspect when determining whether the juvenile is in custody for purposes of *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *Roper v.*

---

[2] The state contends, and the majority agrees, that reconsideration of *Aalim I* is warranted because this court failed to consider Article IV, Section 4(B) of the Ohio Constitution, which generally confers authority to the General Assembly to define the jurisdiction of the courts of common pleas. The state raised that rationale during oral argument on the merits of this case.  *Aalim I* clearly acknowledged that juvenile courts are a legislative creation and that the General Assembly has made substantive changes to the Juvenile Code.  *Aalim I* at ¶ 16.  And a concurring and dissenting opinion stated, "[T]he General Assembly created Ohio's juvenile courts in R.C. Chapter 2151, and consequently, juvenile courts are creatures of statute.  As a statutorily created court, the juvenile court has limited jurisdiction, and it can exercise only the authority conferred upon it by the General Assembly." (Citation omitted.) *Aalim I* at ¶ 39 (Kennedy, J., concurring and dissenting).  Thus, the state's motion for reconsideration relies on no new fact or legal argument that we failed to consider in *Aalim I*.  *See* S.Ct.Prac.R. 18.02(B) ("A motion for reconsideration shall not constitute a reargument of the case * * *").  Reconsideration is therefore unwarranted here.

*Simmons*, 543 U.S. 551, 570-571, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the execution of individuals who were under 18 years of age at the time they committed capital crimes violates the Eighth and Fourteenth Amendments to the United States Constitution).

{¶ 59} The concurring justice's eagerness to reconsider *Aalim I* appears to be based on a reluctance to recognize federal substantive-due-process jurisprudence or to incorporate substantive-due-process protections into the Ohio Constitution. This signals a departure from settled law and the maxim that the federal Constitution provides the floor, not the ceiling, for constitutional rights.

{¶ 60} Aalim, an African-American youth who was 16 years old and, according to his counsel, had no criminal record at the time of his transfer hearing, was nevertheless treated as an adult and haled into the Montgomery County Court of Common Pleas to face a maximum sentence of over 20 years of imprisonment and $40,000 in sanctions (exclusive of court costs and restitution) on two first-degree-felony counts of aggravated robbery with firearm specifications.[3] Given the importance of the constitutional issue before us, and the Supreme Court's silence on the constitutionality of juvenile-transfer statutes since its decision more than 50 years ago in *United States v. Kent*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), today's majority opinion warrants discretionary review by the United States Supreme Court.

{¶ 61} The constitutional vacuum that will now exist in Ohio for juveniles subject to mandatory-transfer hearings cannot be reconciled with the United States

---

[3] After his motion to dismiss on constitutional grounds was denied, Aalim pleaded no contest as part of a plea bargain in which the state dismissed the firearm specifications. He was sentenced to four years of imprisonment on each count, to run concurrently, in addition to five years of postrelease control and restitution of $531.97, ostensibly for the cell phone that he was convicted of stealing.

Supreme Court's recent teachings regarding juveniles, nor can it fulfill the Supreme Court's declaration with respect to transfer hearings that " 'there is no place in our system of law for reaching a result of such tremendous consequences without ceremony.' " *Gault*, 387 U.S. at 30, 87 S.Ct. 1428, 18 L.Ed.2d 527, quoting *Kent* at 554.

{¶ 62} Unable to give countenance to the analysis offered by the majority to achieve its desired result, I dissent.

## BACKGROUND

{¶ 63} As the majority notes, the General Assembly established the first juvenile court in Ohio in Cuyahoga County in 1902 and subsequently expanded the system statewide. *In re Agler*, 19 Ohio St.2d 70, 73, 249 N.E.2d 808 (1969). From their inception, the juvenile courts have dealt with children charged with violating criminal statutes. Whitlatch, *The Juvenile Court—A Court of Law*, 18 Case W.Res.U.L.Rev. 1239, 1241 (1967). In 1937, the General Assembly vested the juvenile courts statewide with "exclusive original jurisdiction * * * [c]oncerning any child who is * * * delinquent." Am.S.B. 268, 117 Ohio Laws 520, 524 (currently codified at R.C. 2151.23(A)(1)). Accordingly, in Ohio, since 1937, children charged with violations of criminal laws have had a statutory entitlement to be dealt with by juvenile court judges who have "expertise" due to their familiarity with the juvenile-justice system and its rehabilitative goals, *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 59.

{¶ 64} As we have previously explained, juvenile courts were established with certain objectives that made them distinct from adult courts, despite their similar roles in adjudicating individuals accused of violating criminal statutes:

> The juvenile courts were premised on profoundly different assumptions and goals than a criminal court, *United States v. Johnson* (C.A.D.C.1994), 28 F.3d 151, 157 (Wald, J., dissenting),

and eschewed traditional, objective criminal standards and retributive notions of justice. Instead, a new civil adjudication scheme arose, with a focus on the state's role as parens patriae and the vision that the courts would protect the wayward child from "evil influences," "save" him from criminal prosecution, and provide him social and rehabilitative services. *In re T.R.* (1990), 52 Ohio St.3d 6, 15, 556 N.E.2d 439; *Children's Home of Marion Cty. v. Fetter* (1914), 90 Ohio St. 110, 127, 106 N.E. 761; *Ex parte Januszewski* (C.C.Ohio 1911), 196 F. 123, 127.

*In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 66.

{¶ 65} Despite these different goals between juvenile and adult courts, the establishment of juvenile courts was not a license for the General Assembly to deprive juveniles of their constitutional rights. In fact, juveniles are entitled to a range of rights grounded in constitutional protections. *See Kent*, 383 U.S. at 562, 86 S.Ct. 1045, 16, L.Ed.2d 84; *In re Winship*, 397 U.S. 358, 367-368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (applying reasonable-doubt standard to juvenile offenders); *Gault*, 387 U.S. at 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (recognizing juveniles' right to counsel in certain juvenile proceedings); *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 26 ("numerous constitutional safeguards normally reserved for criminal prosecutions are equally applicable to juvenile delinquency proceedings").

{¶ 66} When a state legislature attempts to restrict the constitutional protections owed juveniles, the United States Supreme Court restores them. *See Bellotti v. Baird*, 443 U.S. 622, 648, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (lead opinion) (a state cannot unduly burden a minor's right to an abortion); *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (corporal punishment implicates a child's liberty interest); *Breed v. Jones*, 421 U.S. 519, 532-

533, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (double-jeopardy protections apply to juveniles). Thus, the court remains an important check on the legislature ensuring the rights of children in juvenile proceedings, just as it is on guard for legislative overreach in other areas of the law.

**{¶ 67}** We are required to apply the same constitutional check to the mandatory-transfer procedure established in Ohio, considering whether it comports with the requirements of due process and fairness.

**{¶ 68}** The General Assembly established mandatory transfer in 1986 during a wave of pro-punishment legislation.[4] As this case exemplifies, mandatory-transfer hearings are relatively recent in the scheme of juvenile justice in Ohio and the United States. And because a transfer to adult court almost always is intended to allow for a harsher sentence than a juvenile court could impose, mandatory transfer implicates the punitive aspect of sentencing and deprives the juvenile of access to the rehabilitative hallmarks of the juvenile-justice system.

**{¶ 69}** That result is not surprising given that mandatory-transfer hearings were borne of state legislators who, after *Kent* and *Gault*, had become more sanguine about criminal punishment of young offenders in response to perceived—or misperceived—increases in juvenile crime, *see, e.g.*, Waterfall, Note, State v. Muniz*: Authorizing Adult Sentencing of Juveniles Absent a Conviction that Authorizes an Adult Sentence*, 35 N.M.L.Rev. 229, 231 (2005). Juvenile-justice policy shifted from a parens patriae mission toward schemes in which punishment played an increasingly prominent role, particularly for juvenile offenders charged with firearm offenses, homicides, and other indicia of gang-related activity. Bishop, *Juvenile Offenders in the Adult Criminal Justice System*, 27 Crime & Just. 81, 83-84 (2000).

---

[4] In 1986, the General Assembly enacted the first mandatory-transfer statute in Ohio, the precursor of the mandatory-transfer statute currently codified in R.C. Chapter 2152. Sub.H.B. No. 499, 141 Ohio Laws, Part II, 4633 (effective Mar. 11, 1987).

{¶ 70} Rather than seeing the juvenile-justice system's role as ameliorative and rehabilitative, the new legislative approaches were " 'designed to crack down on juvenile crime,' and generally involved 'expanded eligibility for criminal court processing and adult correctional sanctioning' " of juveniles. Waterfall at 231, quoting Bilchik, U.S. Dept. of Justice, *The Juvenile Justice System Was Founded on the Concept of Rehabilitation through Individualized Justice*, 1999 National Report Series: Juvenile Justice Bulletin, at https://www.ncjrs.gov/html/ojjdp/9912_2/contents.html. *See also State v. Hanning*, 89 Ohio St.3d 86, 89, 728 N.E.2d 105 (2000) (the mandatory-transfer statute is "part of Ohio's response to rising juvenile crime"). Rather than seeing juveniles as misguided and immature but worthy of redemption, the new legislation saw them as vicious and savvy, and "as adult-like, incipient career criminals," Bishop at 84.

{¶ 71} State legislators were keenly aware of the ramifications of a juvenile's transfer from juvenile court and its therapeutic milieu to adult court, in which punishment and deterrence are integral. In fact, transfer hearings were at the core of the "get tough" legislative response to the perceived epidemic of juvenile violence in this country, including here in Ohio. *Hanning* at 89; Redding, *Juveniles Transferred to Criminal Court: Legal Reform Proposals Based on Social Science Research*, 1997 Utah L.Rev. 709, 710-715 (1997).

{¶ 72} This "transformation of transfer policy has been quick and dramatic." Bishop, 27 Crime & Just. at 84. Between 1992 and 1997, at least 44 states and the District of Columbia enacted provisions to expediently facilitate the transfer of young offenders to adult court by establishing "offense-based, categorical, and absolute alternatives to individualized, offender-oriented waiver proceedings in the juvenile court" that streamlined the transfer process. *Id*. "As a result, in many states transfer implicates a broad range of offenders who are neither

particularly serious nor particularly chronic, some of whom are not yet in their teens." *Id.* at 84-85.

{¶ 73} In Ohio, the mandatory-transfer provision was one of the hallmarks of the state's "get-tough approach" to crimes committed by juveniles, creating a transfer provision wholly different from the discretionary transfers that previously were the sine qua non of juvenile transfers.[5] *Hanning*, 89 Ohio St.3d at 89, 728 N.E.2d 105. In this new regime, it is not the child's status as a juvenile that governs sentencing but, rather, the forum in which the child offender is adjudicated, so that the sentence ultimately imposed is one that is harsher than what a juvenile court would impose. The transfer hearing implicates far more significant issues than the venue or forum of trial; it serves as a vehicle by which a child offender is deprived of the rehabilitation and treatment potential of the juvenile-justice system.

{¶ 74} Indeed, apparently that is the point. The state asserted at oral argument that the transfer of the juvenile to the adult system is about punishment, not procedure: "But *the crux of the issue is punishment. That's what this is all about. It's not really about process, it's not about procedure. It's about what do we do to punish these juveniles* who are transferred over to adult court." (Emphasis added.) And because the issue implicates punishment, the Supreme Court's teachings in *J.D.B.*, *Miller*, and *Roper* regarding constitutional limitations on juvenile sentencing are implicated as strongly as its holding in *Kent*, 383 U.S. at 560, 86 S.Ct. 1045, 16 L.Ed.2d 84, which recognized that transfer hearings are "critically important" for juveniles.

---

[5] In a discretionary transfer, the juvenile court judge has the discretion to relinquish the juvenile court's jurisdiction over a youth and transfer or "bind over" the juvenile to adult court if the judge determines that the individual is not amenable to care or rehabilitation within the juvenile-justice system and appears to be a threat to public safety. *See* R.C. 2151.26(B)(3). The rubric of a mandatory transfer is quite different.

**ANALYSIS**

**{¶ 75}** The majority's holding today fundamentally misunderstands and minimizes the role of due process in juvenile cases. Although Ohio's mandatory-transfer statute provides some process before depriving a child offender of access to the juvenile-justice system, that process is inadequate under the applicable balancing test established by the United States Supreme Court. Additionally, mandatory transfer does not comport with the concept of fundamental fairness, which we must apply to juveniles at risk of being deprived of a liberty interest. Given the paucity of precedent concerning juvenile-transfer statutes, this case will offer the United States Supreme Court the opportunity to provide further guidance in this area.

### *Even under a Procedural Due-Process Analysis, the Majority Fails to Establish that the Limited Procedure of the Mandatory-Transfer Hearing Satisfies Constitutional Protections*

**{¶ 76}** The Supreme Court recognizes that by enacting legislation, states may create liberty interests that are protected by the federal Due Process Clause. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' " *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), quoting *Joint Anti-Fascist Refugee Commt. v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). "The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Id.*, citing *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "Once it is determined that due process applies, the question remains what process is due." *Id.*

**{¶ 77}** The majority wholly fails to consider the balancing test applicable for determining what process is due to a juvenile at a mandatory-transfer hearing, in all likelihood because there is no way to do so without reaching the conclusion that the process that Ohio's mandatory-transfer statute affords is not enough.[6]

**{¶ 78}** Even if the majority were correct that the right to retaining juvenile status is not fundamental, once a state provides statutory rights greater than those afforded by the federal Constitution, the Constitution prohibits the state from divesting citizens of those rights without due process. *See Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) ("A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right"). *See also Sandin* at 483-484, citing *Wolff* ("we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause").

---

[6] The concurring opinion's attack on substantive due process is also misplaced because the court's decision in *Aalim I* was premised on the tenets of procedural due process, *see Aalim I*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, ¶ 25 ("juvenile procedures themselves also must account for the differences in children versus adults"). And in any event, the concurrence is unpersuasive on its merits. The United States Supreme Court has limited the substantive-due-process doctrine but has not abandoned it. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 573-574, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), citing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Although Justice Thomas recently declared in a dissenting opinion that "the Due Process Clause confers no substantive rights," *Nelson v. Colorado*, __ U.S. __, 137 S.Ct. 1249, 1265, __ L.Ed.2d __ (2017) (Thomas, J., dissenting), his opinion was not joined by any other justice. Similarly unpersuasive are the concurrence's citations to a dissenting opinion and a concurring opinion to support its position as to what federal constitutional law should be. Concurring opinion at ¶ 40, 47.

    The concurring opinion's characterization of the procedural-due-process standard is also flawed. The opinion declares, with citation to a treatise and federal Court of Appeals decisions that cite the same, "When the legislature passes a law of general application, there is no question about the adequacy of the procedures; the legislative process provides all the process that is due." *Id.* at ¶ 41. This statement is remarkably overbroad and offered without any context. In the Supreme Court's most recent due-process decision, the court struck down a state statute as unconstitutional because it created too many procedural hurdles for an individual to vindicate his or her right to regain money paid to the state as the result of a conviction that has been overturned. *Nelson* at __, 137 S.Ct. at 1257-1258. The court applied "[t]he familiar procedural due process inspection instructed by *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)," *Nelson* at __, 137 S.Ct. at 1255, as we should here.

**{¶ 79}** Here, there should be no debate that an alleged juvenile offender has a substantial liberty interest in retaining juvenile status. Since 1937, in Ohio, any child under age 18 who is alleged to have committed a crime has been subject in the first instance to the juvenile court and its attendant procedures. The General Assembly first created a discretionary-transfer scheme, then later created a mandatory-transfer scheme as the procedural mechanisms by which to deprive a child of his or her juvenile status and, as a result, access to the juvenile-justice system.

**{¶ 80}** Unlike some states with mandatory-transfer laws under which the child loses his or her juvenile status at the moment of the filing of a charge alleging a crime covered by the mandatory-transfer statute,[7] Ohio's General Assembly provided some process to the child, requiring the juvenile court to find age eligibility and probable cause to believe that the child committed a crime covered by the mandatory-transfer statute before revoking juvenile status. Because this very limited process is insufficient to vindicate the child's significant liberty interest in retaining juvenile status, I would conclude that it is unconstitutional.

**{¶ 81}** Because the requirements of due process are "flexible and call[] for such procedural protections as the particular situation demands," *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593, 33 L.Ed.2d 484, courts must apply the framework established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), before validating actions adverse to an individual's liberty interest.[8] *Wilkinson v. Austin*, 545 U.S. 209, 224, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005).

---

[7] *See, e.g.*, Conn.Gen.Stat.Ann. 46b-127(a) (a child immediately loses juvenile status upon being charged with certain crimes if the child was at least 15 years old at the time of the alleged offense); D.C.Code 16-2301 (the definition of "child" in juvenile court jurisdictional statute excludes individuals aged 16 or older who are charged with certain crimes); N.Y.Penal Law 30.00 (13- to 15-year-olds are criminally responsible for certain offenses and not subject to the jurisdiction of the juvenile court).

[8] In *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Supreme Court set forth a narrower procedural-due-process inquiry than the *Mathews* framework for application in matters of criminal procedure: whether a state rule " ' offends some principle of justice so rooted in

**{¶ 82}** *Mathews* requires consideration of three distinct factors:

[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews* at 335.

**{¶ 83}** In considering the first factor, there should be no debate that a child's liberty interest in retaining juvenile status is substantial. "The possibility of transfer from juvenile court to a court of general criminal jurisdiction is a matter of great significance to the juvenile." *Breed*, 421 U.S. at 535, 95 S.Ct. 1779, 44 L.Ed.2d 346. The child's liberty interests clearly are in jeopardy if the child is treated as an adult, subject to adult penalties, in criminal courts. Not only do many child offenders receive harsher sentences in adult court, but all child offenders with adult convictions face the collateral consequences of those convictions—including

---

the traditions and conscience of our people as to be ranked as fundamental.' " *Id.* at 202, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). But the Supreme Court has made clear that this narrower standard applies to state procedural rules that are part of the criminal process. *Medina v. California*, 505 U.S. 437, 443, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Thus, it is irrelevant here because we have previously established that "[j]uvenile delinquency proceedings are civil rather than criminal in character," *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 26; *see also In re A.G.*, 148 Ohio St.3d 118, 2016-Ohio-3306, 69 N.E.3d 646, ¶ 26 (O'Donnell, J., dissenting, joined by French and Kennedy, JJ.) (" 'a juvenile court proceeding is a civil action' "), quoting *State v. Adkins*, 129 Ohio St.3d 287, 2011-Ohio-3141, 951 N.E.2d 766, ¶ 10. Notably, I am aware of no juvenile case in which the United States Supreme Court applied the *Patterson* standard to a due-process challenge.

public awareness of their crimes—in a manner far greater than they would in juvenile court.

{¶ 84} Notably, the law requires juvenile courts to seal records pertaining to juveniles who were arrested; juveniles whose cases were resolved without the filing of a complaint or by dismissal on the merits; juveniles who have successfully completed a pretrial diversion program; and juveniles who were adjudicated as unruly children, have turned 18 years old, and are not under the jurisdiction of the juvenile court. R.C. 2151.356(B). Other records may be sealed six months after adjudication or after the unconditional discharge of the individual from the Department of Youth Services. R.C. 2151.356(C)(1)(a). There is no such requirement in adult court, in which the offender's youthful mistakes are likely to stay in the public record forever.

{¶ 85} Indeed, this court has noted that the "collateral legal consequences associated with a felony conviction are severe and obvious." *State v. Golston*, 71 Ohio St.3d 224, 227, 643 N.E.2d 109 (1994). Perhaps most severe is "the infamy and disgrace resulting from a felony conviction [that] seriously affects a person's reputation and economic and social opportunities in our society." *Id.* But an adult criminal conviction also raises more tangible penalties. Convicted felons may not serve on juries or hold an office of "honor, trust, or profit." R.C. 2961.01(A)(1). Depending on the crime, an individual with a conviction may be statutorily precluded from engaging in many occupations and professions. *See, e.g.*, R.C. 1321.37(B)(4) (commercial transactions); R.C. 3772.10(C)(1) (casino employee); R.C. 4709.13(B)(1) (barber); R.C. 4738.07(A)(4) (motor-vehicle-salvage work). Individuals convicted of violating certain drug laws, R.C. 4510.17, or firearm laws, R.C. 2923.122(F)(1), are subject to driver's-license suspension.

{¶ 86} Moreover, research suggests that juveniles face far greater risks of violent attacks and suicide after being sentenced to imprisonment in adult facilities. Kimbrell, *It Takes A Village to Waive A Child . . . or at Least A Jury: Applying*

38

Apprendi *to Juvenile Waiver Hearings in Oregon*, 52 Willamette L.Rev. 61, 65 (2015). "[J]uveniles in adult facilities are five times more likely than adult offenders, and eight times more likely than juvenile offenders in juvenile facilities, to commit suicide." *Id.* at 66.

**{¶ 87}** And importantly, juveniles who are transferred to adult court for a criminal trial are more likely to be incarcerated, more likely to receive longer periods of incarceration, and have significantly higher rates of recidivism and reoffend more quickly. Bishop et al., *The Transfer of Juveniles to Criminal Court: Does It Make a Difference?*, 42(2) Crime and Delinquency 171, 183 (1996). No wonder that over the past decade, many states have enacted laws that once again channel young offenders to juvenile courts. *See Crime and the Adolescent Brain*, N.Y. Times (Mar. 12, 2017). Thus, a child's liberty interest in retaining his or her status as a juvenile subject to the juvenile-justice system is significant.

**{¶ 88}** The second *Mathews* factor is the risk of an erroneous deprivation through the process offered. Ohio's mandatory-transfer statute permits the judge to consider just two factors before transferring to adult court a juvenile accused of committing a crime covered by the law: the juvenile's age at the time of the charged offense and whether there is probable cause to believe that the juvenile committed the mandatory-transfer-eligible conduct. R.C. 2152.12(A). The statute does not permit the judge to consider any mitigating evidence, such as whether the accused lacks criminal history, has a mental illness, is emotionally or psychologically immature, or was under duress at the time of the alleged crime. All of these factors may be considered only at a discretionary-transfer hearing. R.C. 2152.12(E). Most importantly, there may be no consideration of whether the accused is amenable to rehabilitation, the hallmark purpose of the juvenile-justice system.

**{¶ 89}** As the United States Supreme Court recognized in *Miller*, "none of what [*Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)] said about children—about their distinctive (and transitory) mental traits and

environmental vulnerabilities—is crime-specific." *Miller*, 567 U.S. at 473, 132 S.Ct. 2455, 183 L.Ed.2d 407. And the court has recognized that "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper*, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1. Ohio's mandatory-transfer statute creates a system in which a judge has no right to even inquire into a juvenile's potential for rehabilitation, let alone weigh it. Without allowing a judge to conduct any inquiry beyond probable cause or age, there is significant risk of turning a delinquent capable of rehabilitation into a lifelong criminal. Thus, the risk of erroneous deprivation of the child's status as a juvenile offender is substantial.

{¶ 90} The third and final *Mathews* factor is the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593, 33 L.Ed.2d 484, quoting *Joint Anti-Fascist Refugee Commt.*, 341 U.S. at 168, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring). *Mathews* recognizes that "[a]t some point the benefit of an additional safeguard to the individual affected * * * and to society in terms of increased assurance that the action is just, may be outweighed by the cost." 424 U.S. at 348, 96 S.Ct. 893, 47 L.Ed.2d 18.

{¶ 91} But a discretionary-transfer system is not a burden to the state or the bench. With respect to the time and resources required, the difference between an amenability hearing in discretionary-transfer proceedings and the token hearing conducted prior to a mandatory transfer is minimal in the overall scheme. At a

discretionary-transfer hearing, the judge must determine the age of the accused and whether there is probable cause to believe that he or she committed the charged crime, just as a judge must do at a mandatory-transfer hearing. *See* R.C. 2152.12(A) and (B). There are only two other, albeit significant, requirements at a discretionary-transfer hearing: the judge must determine whether the juvenile is "amenable to care or rehabilitation within the juvenile system, and [whether] the safety of the community * * * requires an adult sanction for the juvenile." R.C. 2152.12(B)(3). To assist in making these determinations, the judge must order an investigation "into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C).

{¶ 92} The relevant question when considering the third *Mathews* factor is not whether the process will burden the state at all but, rather, whether the burden of additional procedural safeguards outweighs the child's liberty interest in retaining juvenile status and the risk of erroneously depriving the child of that status.

{¶ 93} The child's interest in retaining his or her juvenile status and the significant risk that children capable of rehabilitation will be prosecuted in adult court as a result of the bare-bones procedure set forth in the mandatory-transfer statute clearly outweigh the state's limited burden of conducting the investigation required by R.C. 2152.12(C) prior to the transfer hearing. Accordingly, I would conclude that the limited "process" afforded under the mandatory-transfer statute is fundamentally inadequate and therefore unconstitutional.

*Fundamental Fairness in Juvenile Proceedings Requires Consideration of a Juvenile's Amenability to Rehabilitation and Treatment in the Juvenile-Justice System*

**{¶ 94}** "[T]he applicable due process standard in juvenile proceedings, as developed by *Gault* [387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527] and *Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368] is fundamental fairness." *McKeiver v. Pennsylvania*, 403 U.S. 528, 543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion). As we have recognized, the meaning of fundamental fairness " 'can be as opaque as its importance is lofty.' " *C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, at ¶ 80, quoting *Lassiter v. Durham Cty. Dept. of Social Servs.*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In *Kent*, the United States Supreme Court emphasized that a juvenile-transfer hearing is a "critically important" proceeding and "must measure up to the essentials of due process and fair treatment." 383 U.S. at 560, 562, 68 S.Ct. 1045, 16 L.Ed.2d 84; *accord Gault* at 12, citing *Kent* at 553.

**{¶ 95}** The majority concludes that Aalim's mandatory-transfer hearing satisfied the fundamental-fairness standards set forth in *Kent* because Aalim had a hearing at which his attorney and his mother were present and was given a written decision on transfer. Majority opinion at ¶ 27. The majority opinion thereby reduces the analysis to consideration of only two facts: the youth's age as a number only and whether there is probable cause to believe that the youth committed the charged crime. *Kent* did not contemplate that result and did not endorse it as a matter of due process or fairness. Quite the contrary.

**{¶ 96}** In *Kent*, the juvenile appellant was subject not to mandatory transfer but to a juvenile court judge's decision to waive the jurisdiction of the juvenile court. But the effect of these two procedures is the same. Kent, like Aalim, was subject to the exclusive jurisdiction of the juvenile court when he was charged at age 16. Kent was also subject to a waiver of the juvenile court's jurisdiction under

the District of Columbia's Juvenile Court Act. Under this statutory scheme, the juvenile court judge could, after conducting a "full investigation," waive the juvenile court's jurisdiction and transfer the case to the district (i.e., adult) court for adjudication of an offender at least 16 years old and charged with an offense that, if committed by an adult, would be a felony. *Kent* at 547-548.

{¶ 97} On appeal, Kent challenged, on statutory and constitutional grounds, the juvenile court judge's waiver of jurisdiction. Although the Supreme Court made clear that juvenile court judges enjoy broad discretion in determining the facts of a given case, it also emphasized that their exercise of that discretion was not "a license for arbitrary procedure." *Kent*, 383 U.S. at 553, 86 S.Ct. 1045, 16 L.Ed.2d 84. In fact, the court explained, the District of Columbia's waiver statute "requires a judgment in each case based on 'an inquiry not only into the facts of the alleged offense but also into the question whether the parens patriae plan of procedure is desirable and proper in the particular case.' " *Id.* at 553, fn. 15, quoting *Pee v. United States*, 274 F.2d 556, 559 (D.C.Cir.1959). As the high court explained:

> The net, therefore, is that petitioner—then a boy of 16—was by statute entitled to certain procedures and benefits as a consequence of his statutory right to the "exclusive" jurisdiction of the Juvenile Court. In these circumstances, considering particularly that decision as to waiver of jurisdiction and transfer of the matter to the District Court was potentially as important to petitioner as the difference between five years' confinement and a death sentence, we conclude that, as a condition to a valid waiver order, petitioner was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision. We believe that this result is required by

the statute read in the context of constitutional principles relating to due process and the assistance of counsel.

*Id.* at 557.

{¶ 98} Thus, the majority misunderstands *Kent* when it suggests that the Supreme Court held in that case only that "due process is satisfied when a juvenile court issues a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel," majority opinion at ¶ 24. *Kent* requires much more.

{¶ 99} For example, the court required that Kent's counsel be given access to the child's social records. These were relevant to waiver because the "full investigation" required consideration of the " 'entire history of the child.' " *Kent* at 559, quoting *Wakins v. United States*, 343 F.2d 278, 282 (D.C.Cir.1964). Additionally, the court noted that a policy memorandum promulgated by the juvenile court regarding application of the District of Columbia's waiver statute required that the juvenile court judge consider such factors as the "sophistication and maturity of the juvenile" and the juvenile's prior contacts with the justice system. *Id.* at 546, fn. 4, 566-567. The scope of this investigation is analogous to the investigation required under Ohio's discretionary-transfer provision, R.C. 2151.12(C).

{¶ 100} In sum, the Supreme Court's decision in *Kent* exemplified its belief in the origins and purpose of the juvenile-justice system, which has emphasized *individualized* assessment of the juvenile followed by rehabilitation and reintegration into society, rather than rote assessments focused only on the child's age and misconduct, with the ultimate goal of punishment. *See Hanning*, 89 Ohio St.3d at 88-89, 728 N.E.2d 105, citing D'Ambra, *A Legal Response to Juvenile Crime: Why Waiver of Juvenile Offenders Is Not a Panacea*, 2 Roger Williams

U.L.Rev. 277, 280 (1997); *Kent*, 383 U.S. at 554, 86 S.Ct. 1045, 16 L.Ed.2d 84. *Kent* cannot be read so narrowly as to support the majority's holding here.

{¶ 101} Using *Kent* as a guide, we turn to the nature of the mandatory-transfer hearing under R.C. 2152.12(A) to determine whether it comports with the essentials of due process and fair treatment that instructed the court's decision in *Kent*. Ohio's mandatory-transfer statute requires some process—namely, a hearing for the limited purpose of determining the juvenile's age and whether there is probable cause to believe that he or she committed a mandatory-transfer-eligible offense. These determinations, however, are merely ministerial, thereby removing the juvenile court from its role as parens patriae. The mandatory-transfer hearing bears the appearance of process but lacks meaningful "ceremony" by eliminating the opportunity for a full investigation into the child's amenability to rehabilitation. *See Kent* at 554 ("We do not consider whether, on the merits, Kent should have been transferred; but there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statements of reasons").

{¶ 102} For example, in Ohio's mandatory-transfer hearing, consideration of age is simply a mathematical calculation and does not involve consideration of the youth's maturity or sophistication. All that remains is a finding of probable cause to believe that the child committed a mandatory-transfer-eligible offense. And this is done as part of a limited process: "while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder." *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 44. Additionally, the state's evidence need not be unassailable, and the state has no burden to disprove alternate theories of the case. *Id.* at ¶ 46, 61.

{¶ 103} The consequences of transfer as a result of such perfunctory procedure are indeed tremendous. Once a juvenile has been transferred to adult court, the state need not prosecute the mandatory-transfer-eligible offense. For example, in this case, Aalim pleaded guilty in the common pleas court's adult division to aggravated robbery, but the state dismissed the firearm specifications. Without those specifications in juvenile court, Aalim would not have been subject to mandatory transfer. Nonetheless, Aalim's convictions in adult court for offenses that no longer were eligible for mandatory transfer carried the weight of adult punishment and its attendant collateral consequences.

{¶ 104} Thus, although the majority heralds the "process" attendant to the superficial hearing provided under Ohio's mandatory-transfer statute, it does not approach the United States Supreme Court's vision of a "critically important" proceeding at which a juvenile faces deprivation of the protections of the juvenile court system, nor does it provide the "ceremony" required of a decision with such tremendous consequences. *Kent*, 383 U.S. at 560, 557, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84. Accordingly, I would conclude that Ohio's mandatory-transfer proceeding does not comply with the fundamental-fairness standard required for juvenile-transfer proceedings.

{¶ 105} Given the majority's failure today to recognize what the Supreme Court has repeatedly held regarding the rehabilitative potential of juvenile offenders and the importance of that determination in juvenile-transfer proceedings, this case implores a closer look by the high court. *See Miller*, 567 U.S. at 478, 132 S.Ct. 2455, 183 L.Ed.2d 407 ("mandatory punishment [of juveniles] disregards the possibility of rehabilitation even when the circumstances most suggest it"); *Graham*, 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 ("Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' "), quoting *Roper*, 543 U.S. at 870, 125 S.Ct. 1183, 161 L.Ed.2d 1; *Roper* at 571 ("From a moral standpoint it would be

misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside' "), quoting *Johnson v. Texas*, 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

{¶ 106} In the context of juvenile transfer to adult court, the Supreme Court has remained silent since *Kent*. This fosters confusion as to what authority state legislatures have to enact mandatory-transfer statutes with limited or no process given the unclear standards for which, if any, procedural and substantive protections juveniles are entitled to prior to transfer to adult court. And this court, like all state courts (which handle almost all of the nation's juvenile criminal cases), is in need of guidance given the paucity of constitutional guideposts and the dramatic increase in the states' use of mandatory transfer after *Kent* and *Gault*—transfers that, as explained above, were intended to preclude juveniles' rehabilitation to allow for their harsher punishment. This is particularly true given that the Supreme Court consistently has made clear over the last decade that in matters of punishment, we must at a minimum consider youth as a factor. *See, e.g.*, *Miller* at 478; *Graham* at 68; *Roper* at 571. In so doing, the court has reminded us, repeatedly, that "[a] child's age is far 'more than a chronological fact.' " *J.D.B.*, 564 U.S. at 272, 131 S.Ct. 2394, 180 L.Ed.2d 310, quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). "Indeed, the court has seemed frustrated that it has repeatedly noted to us that minors are less mature and responsible than adults, that they are lacking in experience, perspective, and judgment, and that they are more vulnerable and susceptible to the pressures of peers than are adults." *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 33 (O'Connor, C.J., concurring), citing *J.D.B.* at 274-275.

{¶ 107} Although *Aalim I* was decided solely on the Ohio Constitution's due-process clause, *see Aalim I*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, at ¶ 25, 31, the majority eschews any distinction between our state Constitution and the United States Constitution for purposes of due-process analysis. Thus, today's opinion is ripe for further review under the United States Supreme Court's authority to define the protections and limits of the federal Constitution. *See, e.g.*, *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914) ("the question whether the process thus sanctioned by the court of last resort of the state constitutes due process of law within the meaning of the 14th Amendment being properly presented to this court for decision, we must exercise an independent judgment upon it").

## CONCLUSION

{¶ 108} "A fundamental requirement of due process is 'the opportunity to be heard.' It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), quoting *Grannis* at 394. A hearing in which there is no consideration of a juvenile's amenability to rehabilitation and treatment in the juvenile-justice system is not a meaningful opportunity to be heard. Because the limited process provided by Ohio's mandatory-transfer statute falls short of due process and fundamental fairness for the juvenile, I would conclude that it is unconstitutional.

{¶ 109} I do not quarrel with the notion that a juvenile who commits a serious, violent crime should be punished or that transfer to adult court is proper in some instances. *See, e.g.*, *State v. Watson*, 47 Ohio St.3d 93, 547 N.E.2d 1181 (1989) (holding that a juvenile court judge's broad discretion to retain or relinquish jurisdiction included discretion to order the transfer of a 15-year-old male with no prior criminal record, no major disciplinary issues at school, and no psychiatric disorder because he had beaten another juvenile to death with a tree limb). But the

suggestion that this court is not authorized to invalidate a transfer statute that does not pass constitutional muster offends the doctrines of separation of powers and checks and balances, both hallmarks of our republic. Here, the mandatory-transfer statute is one of those legislative enactments that falls constitutionally short. The majority's decision ignores that juveniles are entitled to a liberty interest that cannot be arbitrarily deprived, and reduces the role of juvenile court judges, who are elected by the people to determine, among other things, whether a juvenile is amenable to rehabilitation. For these reasons, and knowing that "history has its eyes on" us, I cannot give countenance to the majority's decision on reconsideration. *See* Lin Manuel-Miranda, "History Has Its Eyes On You," Hamilton (Original Broadway Cast Recording).

O'NEILL, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., dissenting.**

{¶ 110} Respectfully, I dissent. For the reasons explained in my dissenting opinion in *State v. Gonzalez*, __ Ohio St.3d __, 2017-Ohio-777, __N.E.3d __ ¶ 73, I disagree with the decision to reconsider this case in order to vacate our prior holding. As in *Gonzalez*, there is nothing new to reconsider here; the only thing that has changed is the makeup of this court as a result of the 2016 election. I am compelled instead to defend the constitutional right that we declared in *State v. Aalim*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __ ("*Aalim I*").

{¶ 111} Last term, we declared that all children, including appellant, Matthew I. Aalim, "are entitled to fundamental fairness in the procedures by which they may be transferred out of juvenile court for criminal prosecution, and an amenability hearing like the one required in the discretionary-transfer provisions of [R.C. 2152.12(B)] is required to satisfy that fundamental fairness." *Aalim I* at ¶ 26. Instead of using the discretionary-transfer provisions in this case, however, the juvenile court transferred Aalim to adult court under the mandatory-transfer

provisions of R.C. 2152.12(A) to face trial for aggravated robbery. The distinction is significant. The mandatory-transfer mechanism provides for a hearing only to determine whether there is probable cause to believe that the juvenile committed an enumerated serious crime and whether the juvenile was 16 or 17 years old at the time of the charged conduct. R.C. 2152.12(A)(1) and 2152.02(BB) and (CC). Under this procedure, the juvenile court does not use its expertise and discretion to determine whether this pathway to justice is appropriate for this juvenile. It is a formulaic solution to a complex situation. It is the legislature's way of saying, "If you are a juvenile offender you will be treated fairly—unless you have committed a serious crime." As a remedy for the violation of the constitutional right that we recognized, we reversed Aalim's convictions and remanded the matter to the juvenile court for an amenability hearing. *Aalim I* at ¶ 32.

{¶ 112} We based our decision in *Aalim I* on the history and development of the justice system's treatment of children charged with criminal misconduct. *Id.* at ¶ 14-24. Today, the majority abandons *Aalim I*'s acknowledgment that "children are constitutionally required to be treated differently from adults," *id.* at ¶ 25. Today's ruling carves out an exception to that different treatment for 16- and 17-year-olds who commit serious crimes. And in the process, it discards the fundamental fairness that is due to the children who are arguably most in need of a special inquiry prior to being tossed into the adult criminal-justice system.

{¶ 113} In a bygone era, children were entitled not to life, liberty, or property but merely "to custody." *In re Gault*, 387 U.S. 1, 17, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Children were therefore treated by the state the same way that they are treated by their parents, and children did not receive the benefit of "the requirements which restrict the state when it seeks to deprive a person of his liberty." *Id.* This proved to be an intolerable state of affairs, often leading to unfair and arbitrary results. *Id.* at 17-22. In the modern era, courts must provide children with procedures that " 'measure up to the essentials of due process and fair

treatment.' " *Id.* at 30, quoting *Kent v. United States*, 383 U.S. 541, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

{¶ 114} Our holding in *Aalim I*, put in its simplest form, was that the state cannot establish a juvenile-justice system that purports to treat every person under the age of 18 as a "child" until transfer has occurred, R.C. 2152.02(C), and then deny some of those children the protections of transfer procedures that "account for the differences in children versus adults." *Aalim I*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, at ¶ 24-25.

{¶ 115} Our decision in *Aalim I* was grounded in principles of both procedural and substantive due process. Procedural due process requires " 'such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Id.* at 333, quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). The government's overriding purposes in the area of juvenile dispositions under R.C. Chapter 2152 are "to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." R.C. 2152.01(A). On balance, and in light of the government's role with regard to children, I believe that a juvenile-transfer hearing cannot be "meaningful" within the requirements of procedural due process without procedures like those found in the discretionary-transfer provisions of R.C. 2152.10(B) and 2152.12(B), which require consideration of factors relevant to the overriding purposes of the juvenile-justice system declared in R.C. 2152.01(A).

{¶ 116} *Aalim I* was grounded in principles of substantive due process as well. Substantive due process represents, at its core, the balance between "the

liberty of the individual" and "the demands of organized society." *Poe v. Ullman*, 367 U.S. 497, 542, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). This balance between liberty and order was

> struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound.

*Id.* In *Aalim I*, we recounted the numerous ways in which we, as a self-aware and ever-evolving society, have developed a new tradition: the recognition that children are *childlike*. *See* __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, at ¶ 21-23. Liberty therefore demands special treatment for children regardless of the momentary whims of our organized society. *See id.* at ¶ 24-26. Our decision in *Aalim I* was not some radical departure from our national tradition. It was the expression of our social conscience.

**{¶ 117}** The new majority position has been explicitly rejected by the United States Supreme Court. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847-848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects"). The new majority in this matter approaches the development of our constitutional guarantee of due process "in a literalistic way, as if we had a tax statute before us," instead of approaching our Constitution as what it truly is: "the basic charter of our society, setting out in spare but meaningful terms the principles of government," *Poe* at 540

(Harlan, J., dissenting). For these reasons, I disagree with the majority and would leave our judgment in *Aalim I* undisturbed.

{¶ 118} Today's decision is a mistake, and it should be treated that way. *Aalim I* was issued on December 22, 2016. From that day until today, it has been the law of Ohio that R.C. 2152.10(A) and 2152.12(A) are incompatible with the Fourteenth Amendment to the United States Constitution. *Aalim I* at ¶ 12-26. On that day, we held that R.C. 2152.10(A) and 2152.12(A) were not enforceable. Nothing has changed since that date other than the makeup of this court.

{¶ 119} For the foregoing reasons, I dissent.

––––––––––––––––––

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Andrew T. French, Assistant Prosecuting Attorney, for appellee.

Amanda J. Powell; and Timothy Young, Ohio Public Defender, and Charlyn Bohland, Assistant Public Defender, for appellant.

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor, Chief Counsel, Appellate Division, urging reconsideration for amicus curiae, Ohio Prosecuting Attorneys Association.

––––––––––––––––––